NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4131-15T3

NEW JERSEY ELECTION LAW
ENFORCEMENT COMMISSION,

    Petitioner-Appellant,

v.

JOSEPH DIVINCENZO and
JORGE MARTINEZ,

    Respondents-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **September 8, 2017**
>
> **APPELLATE DIVISION**

Argued November 1, 2016 — Decided  September 8, 2017

Before Judges Messano, Espinosa and Suter.

On appeal from the Election Law Enforcement
Commission, Docket Nos. C-8 0700 01, 01-G2010
and C-8 0700 01, 01-P2014.

Amanda S. Haines argued the cause for
appellant (Ms. Haines, attorney; Ms. Haines,
Demery J. Roberts and Scott T. Miccio, on the
brief).

Angelo J. Genova argued the cause for
respondents (Genova Burns, LLC, attorneys; Mr.
Genova, of counsel and on the brief; Lawrence
Bluestone, Brett M. Pugach and Kevin R.
Miller, on the brief).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

The New Jersey Election Law Enforcement Commission (ELEC or

the Commission) appeals from an initial decision by an Administrative Law Judge (ALJ) that it lacked jurisdiction to issue a complaint, which was deemed adopted pursuant to N.J.S.A. 52:14B-10(c) at a time when the Commission lacked a sufficient number of members to act due to longstanding vacancies. The resulting question of first impression implicates the primacy of an administrative agency's decisional authority established by the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31, the exclusive jurisdiction of this court to review agency action, and the interpretation of the deemed-adopted provision as applied to the circumstances here. For the following reasons, we reverse.

## I.

The underlying controversy was the subject of an earlier opinion, N.J. Election Law Enf't Comm'n v. DiVincenzo (ELEC I), 445 N.J. Super. 187 (App. Div. 2016), in which we denied the Commission's emergent application to stay the time to act on the ALJ's initial decision until after the vacancies in the Commission were filled. We reviewed the facts in that opinion at length and, for ease of reference, recite the salient facts relevant to this appeal.

ELEC was created as an independent agency, N.J.S.A. 19:44A-5, and charged with the duty to enforce violations of the New Jersey Campaign Contributions and Expenditures Reporting Act (the

Act), N.J.S.A. 19:44A-1 to -47. N.J.S.A. 19:44A-5 governs the membership of the Commission, specifying it shall consist of four members appointed by the Governor to staggered terms and that "[n]o more than two members shall belong to the same political party."

In July 2011, the Commission consisted of four members: Chairman Ronald J. DeFilipis, Vice Chairman Walter Timpone, Amos Saunders and Lawrence Weiss. DeFilipis and Saunders were Republicans; Timpone and Weiss were Democrats. All four members of the Commission voted to conduct a formal investigation into purported violations of the Act by respondents Joseph DiVincenzo, a Democratic candidate, and his campaign treasurer, Jorge Martinez, during the 2010 general election for County Executive of Essex County and prior to the 2014 primary election.

The Commission authorized the issuance of a complaint against respondents in January 2013. At that time, the vacancy created by Weiss's death in November 2011 had not been filled. In addition, because Timpone had recused himself, no Democrat participated in the authorization. Therefore, the two remaining members who voted to authorize the complaint were both Republicans. The complaint was issued approximately nine months later in September 2013.

A-4131-15T3

Respondents challenged the jurisdiction of the Commission to authorize the complaints, contending that a valid authorization required a bipartisan agreement to file a complaint and "the requisite number of Commissioners."  The matter was transferred to the Office of Administrative Law (OAL) as a contested case.

Respondents filed a motion for summary decision in the OAL, seeking dismissal of the complaint with prejudice pursuant to N.J.A.C. 1:1-12.5.  The ALJ issued an initial decision on September 16, 2015, in which he adopted respondents' argument that ELEC required three Commission members from two parties to have the necessary quorum to act.  Finding ELEC lacked jurisdiction to issue the complaint, he concluded the complaint was "void ab initio and must be dismissed."

Pursuant to N.J.S.A. 52:14B-10(c), ELEC had forty-five days in which to adopt, reject or modify the ALJ's decision and was permitted to extend that time for one forty-five day period before the ALJ's decision was deemed adopted as the agency's final decision.  As we observed in ELEC I, supra, 445 N.J. Super. at 193,

> Under usual circumstances, the ALJ's decision
> would be subject to review by ELEC, which has
> the unquestionable authority to reject the
> ALJ's decision that it lacked jurisdiction to
> issue the complaint.  See N.J.S.A. 52:14B-
> 10(c). At that point, ELEC's final decision

would be subject to review by this court. N.J.S.A. 52:14B-12.

As a result of Saunders' death in 2015 and Timpone's recusal, however, Commissioner DeFillipis was the only acting member of the Commission during the forty-five day period. No further extensions of the period in which the Commission could adopt, reject or modify the ALJ's decision were permitted without the unanimous consent of the parties.[1] N.J.S.A. 52:14B-10(c). Respondents declined to provide such consent.

ELEC sought emergent relief to toll the extension period. We granted the motion to file an emergent application and, after briefing and oral argument, denied the motion for a stay and vacated the order tolling the forty-five-day period for acting on the initial decision. ELEC I, supra, 445 N.J. Super. at 206. The initial decision by the ALJ was therefore deemed adopted pursuant to N.J.S.A. 52:14B-10(c).

In ELEC I, supra, 445 N.J. Super. at 194, we were not asked to decide the merits of the issue central to the ALJ's decision, i.e., whether ELEC lacked jurisdiction to issue a complaint because it was authorized by two of the three members, both of whom were Republican. That issue is presented to us now.

_____

[1]  ELEC conceded it could not convene or take action based upon the participation of one commissioner.

5                                    A-4131-15T3

Respondents present several arguments against appellate review of the ALJ's decision.

The notice of appeal from the deemed-adopted decision was filed by Commission staff. Respondents filed a motion to dismiss the appeal, arguing in part that staff members lacked authority to file an appeal on behalf of the Commission. As we noted in our order denying the motion to dismiss, even under respondents' interpretation of the quorum requirement, subsequent appointments to the Commission resulted in a sufficient number of members to form a quorum for action. We observed that, pursuant to Rule 2:8-2, the Commission retained the authority to move for the dismissal of the appeal and stated that, in the absence of any motion to dismiss the appeal by May 15, 2017, we would proceed to the merits of the appeal. We conclude from the absence of any motion to dismiss by the Commission that it endorses the appeal and adopts the arguments advanced on its behalf. The argument regarding the standing of staff to pursue the appeal is therefore moot.

Respondents press additional arguments regarding standing. They contend the Commission is not an "aggrieved party" and

therefore lacks standing to appeal its own final agency decision[2] and that ELEC's appeal presents a non-justiciable political question. Respondents also argue the Commission should not be able to circumvent the time limit in N.J.S.A. 52:14B-10(c) by pursuing an appeal of a deemed-adopted decision, an issue we address later in the decision.

The Commission responds that it has the right to appeal the decision pursuant to Rule 2:2-3(a)(2), that the ALJ decided a purely legal issue that did not fall within "the ALJ's statutorily assigned role," and that, because "a clearly erroneous initial decision became a deemed-adopted final decision due to the agency head's inability to act or obtain additional extensions, appellate review must be available."

A.

In New Jersey, "standing to seek judicial review of an administrative agency's final action or decision is available to the direct parties to that administrative action as well as any one who is affected or aggrieved in fact by that decision." Camden Cty. v. Bd. of Trs. of the Pub. Emps. Ret. Sys., 170 N.J. 439, 446

---

[2]  In support of their argument that ELEC lacks standing to appeal, respondents rely upon cases from other jurisdictions that are distinguishable because they concern whether an agency may appeal a decision affecting the rights of third-parties rather than the issue here: whether an agency has the right to appeal a decision that dictates how the agency itself may operate.

(2002).  "To possess standing . . . a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision."  Id. at 449.

The Commission is given broad authority under N.J.S.A. 19:44A-6 to enforce the Act and is a party to the action that is the subject of this appeal.  The deemed-adopted decision effectively curtailed the Commission's discharge of its statutory responsibilities.  We are satisfied that, under the circumstances here, ELEC's appeal is not barred on the ground that it is not an aggrieved party.

B.

Respondents argue the appeal presents a nonjusticiable political question because ELEC seeks to remedy issues "caused by the Governor's failure to appoint or the Senate's failure to confirm members of the Commission to fill vacancies."

"The nonjusticiability of a political question is primarily a function of the separation of powers."  Gilbert v. Gladden, 87 N.J. 275, 281 (1981) (quoting Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 706, 7 L. Ed. 2d 663, 682 (1962)).  To dismiss a matter as nonjusticiable, one of the following "criteria must be inextricable from the facts and circumstances of the case":

8

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

[Id. at 282 (quoting Baker, supra, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686).]

The question presented here is one of statutory interpretation and does not implicate any of the criteria for a nonjusticiable controversy identified by the Court in Gilbert. Ibid. Contrary to respondents' attempt to characterize it otherwise, our resolution of that question does not intrude upon the powers of other branches of government.

III.

We begin our review of the merits of the appeal by examining the scope of the ALJ's authority to issue an initial decision, relative to the decisional authority of the administrative agency.

Before the OAL was established in 1979, "most hearings were conducted by hearing examiners who were usually agency employees," compromising the appearance of "fairness and impartiality." In

re Kallen, 92 N.J. 14, 22 (1983).  The OAL was established to

address this problem:

> The major change effected was to replace
> agency hearing officers with a new group of
> independent hearing officers, i.e.,
> "administrative law judges."  The ALJs now
> perform essentially the same functions that
> hearing examiners formerly performed in
> contested cases.  They conduct the hearings,
> make recommended factual findings, and
> recommend decisions to the agency heads.
>
> [Id. at 22-23 (citing N.J.S.A. 52:14B-10; S.
> State Gov't, Fed, & Interstate Relations &
> Veterans Affairs Comm., Statement to S. 766
> (May 1, 1978); In Re Unif. Admin. Procedure
> Rules, 90 N.J. 85, 91 (1982): Unemployed—
> Employed Council of N.J., Inc. v. Horn, 85
> N.J. 646, 650 (1981)).]

Like the hearing examiners they replaced, ALJs derive their

authority to hear a contested case from the agency.  N.J.A.C. 1:1-

3.2(a) states, in pertinent part:

> The Office of Administrative Law shall acquire
> jurisdiction over a matter only after it has
> been determined to be a contested case by an
> agency head and has been filed with the Office
> of Administrative Law . . . .  The Office of
> Administrative Law shall not receive, hear or
> consider any pleadings, motion papers, or
> documents of any kind relating to any matter
> until it has acquired jurisdiction over that
> matter . . . .
>
> [(Emphasis added).]

"While the statute creating the OAL focuse[d] on the integrity

of the hearing function," King v. N.J. Racing Comm'n, 103 N.J.

412, 420 (1986), "the Legislature intended no alteration of the regulatory authority or basic decisional powers of administrative agencies," In Re Unif. Admin., supra, 90 N.J. at 94. The Legislature preserved "agency jurisdiction and regulatory responsibility," with the agency retaining "the exclusive right ultimately to decide these cases." King, supra, 103 N.J. at 420.[3]

It is the head of the agency who "determine[s] whether a case is contested," N.J.S.A. 52:14F-7(a), and makes the decision whether to refer the matter to the OAL or "to conduct the hearing directly and individually," N.J.S.A. 52:14F-8(b). The agency is not required to transfer the matter to the OAL or adopt any of the ALJ's findings or conclusions.[4] See Kallen, supra, 92 N.J. at 20 (citing N.J.S.A. 52:14B-10(c)).

ALJs "have no independent decisional authority." In re Unif. Admin., supra, 90 N.J. at 94. Because the agency's ultimate

_____

[3] See also N.J.S.A. 52:14B-10(c) (gives the head of an agency the power to "adopt, reject or modify the recommended report and decision" of an ALJ); N.J.S.A. 52:14F-7(a) (APA "shall [not] be construed to deprive the head of any agency of the authority . . . to determine whether a case is contested or to adopt, reject or modify the findings of fact and conclusions of law of any" ALJ); N.J.S.A. 52:14F-8(b) (providing that no ALJ shall hear a contested case in which the agency head has determined "to conduct the hearing directly and individually").

[4] Apart from appeals by a law enforcement officer or firefighter, no individual or entity may file a request for a contested hearing with the OAL. N.J.A.C. 1:1-3.1(b).

decisional authority "is directly and integrally related to its regulatory function," any attempt by an ALJ "to exercise such authority would constitute a serious encroachment upon an agency's ability to exercise its statutory jurisdiction and discharge its regulatory responsibilities." Ibid. An agency's regulatory responsibilities extend to its decisions in individual contested cases:

> While a contested case deals only with an individual dispute, its resolution necessarily reflects the agency's public policy, for "[i]n effect, an agency engages in ad hoc rulemaking every time it decides a contested case . . . . Thus, the agency's decisional authority over contested cases is directly and integrally related to its regulatory function."
>
> [Kallen, supra, 92 N.J. at 21 (alterations in original) (quoting In re Unif. Admin., supra, 90 N.J. at 93-94).]

The Supreme Court has acknowledged that ALJs are to be accorded independence in executing their "certain important responsibilities . . . to conduct hearings, make factual findings, and recommend decisions in contested cases for the various State agencies." In re Unif. Admin., supra, 90 N.J. at 94 (emphasis added) (citing N.J.S.A. 52:14F-5(n)).

The ALJs' responsibilities — to conduct hearings, make factual findings and recommend decisions — frame the scope of their authority. So, in In re Tenure Hearing of Onorevole, 103

N.J. 548, 556 (1986), the Court found it appropriate, in light of the need for the ALJ to control the proceedings, to recognize the OAL's authority to make an initial decision on the disqualification of an attorney on ethics grounds.  The Court noted, however, that all such decisions "would be subject to appropriate judicial review, whether on an interlocutory basis or otherwise."  Ibid. As a result, "an initial ruling by the OAL would [not] in any way nullify or frustrate the exclusive authority of th[e] Court as to such matters."  Ibid.

When, however, an ALJ's initial decision preempted the agency's final determination in Kallen, the Court reached a different conclusion.  The Deputy Director of the agency ordered a remand to the OAL for additional evidence to be received and considered after the ALJ issued his initial decision.  Kallen, supra, 92 N.J. at 19.  The ALJ claimed he had the authority to refuse to comply with the Director's order of remand.  Ibid.  The Court observed, "if the ALJ's attempt to resist the remand were upheld, . . . the ALJ's unilateral act would have effectively predetermined, if not preempted, the Director's final decision, thereby seriously impinging upon the regulatory prerogatives of the agency."  Id. at 23.  The Court concluded, "the Director here, not the ALJ, had the final decisional authority.  Hence, the ALJ

had no authority to refuse to obey the Director's Order of Remand." Ibid.

In Jones v. Department of Community Affairs, Division of Codes and Standards, Bureau of Rooming and Boarding House Standards, 395 N.J. Super. 632 (App. Div. 2007), we considered whether an ALJ could rule upon a constitutional issue in an initial decision. In holding an ALJ may do so, we identified certain conditions that provide appropriate parameters for such a decision. Id. at 636-37. We held an ALJ may do so (1) "to the extent the issues arise legitimately in the context of the contested case hearing and are necessary for a complete disposition of any genuine issue in the contested case" and subject to (2) "the agency head's authority to make the final decision in the case" and (3) "judicial review." Id. at 636.

Although it is arguable that the question regarding the applicable quorum rule arose legitimately in the context of the contested case here, the other safeguards we cited in Jones are notably absent if foreclosed by the deemed-adopted provision. The ALJ's "initial decision" on a question of law is conditionally permitted because it is subject to the agency's decisional authority and judicial review. As we have noted, it is only through the agency's exercise of jurisdiction that the ALJ derives any authority to hear a contested case. The ALJ's initial decision

14

dictated the parameters of the agency's jurisdiction and concluded the agency lacked jurisdiction. Clearly, such a decision must be subject to the agency's review if it is not to encroach upon the agency's ultimate decisional authority. Moreover, if the Commission is not permitted to appeal, there would be no judicial review of the ALJ's initial decision on a question of law.

IV.

"Judicial review of administrative agency action is a matter of constitutional right in New Jersey." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 383 (2013) (citing N.J. Const. art. VI, § 5, ¶ 4). Pursuant to that constitutional provision, the Supreme Court adopted Rules 2:2-3 and 2:2-4, vesting the Appellate Division with exclusive jurisdiction for the review of administrative agency action and inaction, Prado v. State, 186 N.J. 413, 422 (2006); Pascucci v. Vagott, 71 N.J. 40, 52 (1976), "with the intention that every proceeding to review the action or inaction of a state administrative agency would be by appeal to the Appellate Division," Beaver v. Magellan Health Servs., Inc., 433 N.J. Super. 430, 441 (App. Div. 2013) (quoting Cent. R.R. Co. of N.J. v. Neeld, 26 N.J. 172, 185, cert. denied, 357 U.S. 928, 78 S. Ct. 1373, 2 L. Ed. 2d 1371 (1958)), certif. denied, 217 N.J. 293 (2014); Found. for Fair Contracting, Ltd. v. N.J. State Dep't of Labor, 316 N.J.

Super. 437, 451 (App. Div. 1998) ("An appeal from administrative agency action is exclusively cognizable in the Appellate Division.").

The exclusivity of our jurisdiction may not be circumvented by framing a claim as one ordinarily presented in the trial court, such as actions in lieu of prerogative writs or declaratory judgments, or through procedural maneuvers such as consolidating an administrative action with a legal action in the trial court. Beaver, supra, 433 N.J. Super. at 441-42; Mutschler v. N.J. Dep't of Envtl. Prot., 337 N.J. Super. 1, 9 (App. Div.), certif. denied, 168 N.J. 292 (2001); Pressler & Verniero, Current N.J. Court Rules, comment 3.2.1 on R. 2:2-3 (2017); see also Prado, supra, 186 N.J. at 423-24 (reversing Appellate Division decision that found exception to Rule 2:2-3(a)(2) exclusive jurisdiction on efficient judicial administration grounds when a case was already pending in the Law Division).

The Constitution also vests the Supreme Court and the Appellate Division with "such original jurisdiction as may be necessary to the complete determination of any cause on review." N.J. Const. art. VI, § 5, ¶ 3; see also R. 2:10-5; In re Polk, 90 N.J. 550, 577-578 (1982) (noting, despite the absence of an "express grant of jurisdiction . . . to revise an administrative

sanction on the grounds of excessiveness," the Court could exercise its original jurisdiction to do so).

Therefore, even when a dispute has been "improvidently brought before [us]," we may elect to exercise original jurisdiction "in the public interest." Nat. Med., Inc. v. N.J. Dep't of Health & Senior Servs., 428 N.J. Super. 259, 267 (App. Div. 2012) (citation omitted) (finding the Department of Health's refusal to accept an application from appellants was so effectively dispositive of the case as to be functionally akin to a final judgment, permitting its appeal without an ensuing order); Vas v. Roberts, 418 N.J. Super. 509, 524 (App. Div. 2011) (exercising jurisdiction although the proper forum for challenging actions of the Speaker of the General Assembly was the Law Division); see also In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 404 N.J. Super. 29, 39 n.6 (App. Div. 2008) (stating we regarded the advisory opinion on appeal as analogous to a final declaratory judgment, and "[i]f it were not, we would grant leave to appeal in light of the public importance of the issue"), aff'd, 201 N.J. 254 (2010).

"[T]he exercise of original jurisdiction is appropriate when there is 'public interest in an expeditious disposition of the significant issues raised.'" Price v. Himeji, LLC, 214 N.J. 263, 294 (2013) (quoting Karins v. City of Atlantic City, 152 N.J. 532,

540-41 (1998)).  In determining whether to exercise original jurisdiction, we "must weigh considerations of efficiency and the public interest that militate in favor of bringing a dispute to a conclusion, [and] also must evaluate whether the record is adequate to permit the court to conduct its review."  Id. at 295.  It is particularly appropriate to exercise original jurisdiction "to avoid unnecessary further litigation, as where the record is adequate . . . and . . . the issue to be decided is one of law and implicates the public interest."  Vas, supra, 418 N.J. Super. at 523-24 (citations omitted).

The issue here is purely one of law, with no further need to develop the record.  As we observed in ELEC I, supra, 445 N.J. Super. at 196-97, this matter also presents an issue of significant public interest because "the public has a substantial interest in the enforcement of the Act" and the controversy "pit[s] two clearly enunciated legislative objectives against each other: the primacy of an administrative agency to render the final decision in a contested case . . . and the importance of precluding unnecessary delay in" agency action.

This appeal presents a third dimension, of constitutional import, because, if the restriction imposed by N.J.S.A. 52:14B-10(c) ends all possibility of review by this court, the application of the deemed-adopted provision would tacitly, but effectively,

thwart the exercise of the Appellate Division's exclusive jurisdiction.

Because "judicial review of administrative agency determinations has the support of a special constitutional provision," it is "largely immunize[d] from legislative curbs." In re Senior Appeals Exam'rs, 60 N.J. 356, 363 (1972). Observing that, in New Jersey, "judicial review has been most freely available with the least encumbrance of technical apparatus," the Court reviewed federal decisions "where Congress admittedly has much broader power to preclude judicial review of agency determinations." Ibid. (citation omitted).

We derive the following principles from that review. "[Legislative] intent to preclude judicial review [is] not to be lightly inferred, . . . reviewability [is] the rule, and . . . nonreviewability [is] 'an exception which must be demonstrated.'" Id. at 364 (quoting Burlow v. Collins, 397 U.S. 159, 166, 90 S. Ct. 832, 838, 25 L. Ed. 2d 192, 199 (1970)). "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of [the Legislature]." Ibid. (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 140, 87 S. Ct. 1507, 1511, 18 L. Ed. 2d 681, 686 (1967)).

Even before its amendment in 2014, the "evil" the deemed-

19

adopted provision "was designed to remedy" was "[a]gency delay and inaction." King, supra, 103 N.J. at 421. By instituting an automatic approval provision triggered by agency inaction within the designated period of time, N.J.S.A. 52:14B-10(c) was designed "to thwart undue delay in agency action" and "encourage prompt consideration and disposition of contested cases." Id. at 419. There is nothing in the language of the statute or its legislative history to support the notion that the Legislature intended to preclude judicial review of an ALJ's initial decision that was made final pursuant to the deemed-adopted provision when the agency was unable to discharge its decisional authority as a result of unfilled vacancies.[5] We will not infer such intent, which would subvert our constitutionally-sanctioned mandate, where it has not been clearly demonstrated. See In re Senior Appeals Exam'rs, supra, 60 N.J. at 363.

We are unpersuaded by respondents' argument that allowing

---

[5] There is also some support for this conclusion in cases decided before the 2014 amendment to N.J.S.A. 52:14B-10(c). See, e.g. King, supra, 103 N.J. at 424; Newman v. Ramapo Coll. of N.J., 349 N.J. Super. 196, 204 (App. Div. 2002); Mastro v. Bd. of Trs., Pub. Emps.' Ret. Sys., 266 N.J. Super. 445, 452 7.1 (App. Div. 1993) (noting "[i]f an agency has no power to reconsider an ALJ's decision which has been automatically approved pursuant to N.J.S.A. 52:14B-10(c), it is arguable that the agency should be allowed to appeal to this court to seek reversal of a manifestly erroneous decision").

this appeal to proceed permits ELEC to circumvent the time restrictions of N.J.S.A. 52:14B-10(c). Although we recognize that, as amended, the deemed-adopted provision "does not provide a safe harbor for an agency that is unable to act within the prescribed period through no fault of its own," ELEC I, supra, 445 N.J. Super. at 198, it is important to note the record is devoid of any effort by ELEC to evade the time restrictions of the statute. To the contrary, it sought emergent relief in an attempt to toll the time period until it had a sufficient number of members to act and even filed a timely appeal through its staff to preserve its right to appeal the deemed-adopted provision. In short, "there is no indication of bad faith, inexcusable negligence, or gross indifference on the part of the Commission." King, supra, 103 N.J. at 421.[6] The transcendent issue is not whether ELEC sought to circumvent the restrictions of the statute; it is whether our exclusive jurisdiction to review agency action may be circumvented by an ALJ's decision that denies the agency its authority to act and has become final through the deemed-adopted provision. Under the unusual circumstances of this case, we hold that it may not.

---

[6] It is clear that, prior to the 2014 amendment, the record here would have militated against the application of the deemed-adopted provision. See id. at 420-23.

V.

We turn to the substantive issue here, whether there was a legal quorum for the authorization of the complaint. In addition to arguing an insufficient number of members voted, respondents argue the vote was defective because the voting members were not affiliated with two different political parties.[7] We reject both these arguments.

A.

The question regarding the requisite number of voting members turns on whether the common law quorum rule applies or the Act establishes a different quorum requirement for the authorization of a complaint.

In ELEC I, supra, we described the operation of the common law quorum rule:

> Under the common law quorum rule, "a majority of all the members of a municipal governing body constitute[s] a quorum; and in the event of a vacancy a quorum consists of a majority of the remaining members." Ross v. Miller, 115 N.J.L. 61-63 (1935); see also Matawan Req'l Teachers Ass'n v. Matawan-Aberdeen Req'l Sch. Dist. Bd. of Educ., 223 N.J. Super. 504, 507 (App. Div. 1988) ("At common law, a majority of a public body constitutes a

---

[7]  Respondents also argue the Commission lacked subject matter jurisdiction over their case because it had no power to render a final decision due to the vacancies on the Commission. In light of our decision that the Commission had a legal quorum, we need not address this argument.

quorum."). In <u>King</u>, <u>supra</u>, 103 <u>N.J.</u> at 418, our Supreme Court addressed statutory quorum language mirroring the common law quorum rule, finding:

> [I]t is not relevant whether a member is <u>physically absent</u>, is disqualified because of interest, bias, or prejudice, or other good cause, or voluntarily recuses herself or himself. <u>A member who is disqualified from participating in a particular matter may not be counted in determining the presence of a legal quorum.</u>

> [445 <u>N.J. Super.</u> at 199-200 (alterations in original).]

Thus, under the common law quorum rule, any position left vacant, either by death or recusal due to conflict of interest, is not counted to determine what the legal quorum is. "[W]here a quorum exists, a majority of those present are authorized to take action." <u>Abbott v. Burke</u>, 206 <u>N.J.</u> 332, 372 (2011); <u>accord</u> <u>Ross</u>, <u>supra</u>, 115 <u>N.J.L.</u> at 63. As applied here, a majority of the legal quorum voted to authorize the complaint because two members voted and the other two positions were "vacant" due to death and recusal.

We also observed,

> The common law rule applies absent a "pertinent statute to the contrary." <u>King v. N.J. Racing Comm'n</u>, 205 <u>N.J. Super.</u> 411, 415, (App. Div. 1985), <u>rev'd on other grounds</u>, 103 <u>N.J.</u> 412 (1986). <u>See</u> <u>Hainesport Twp. v. Burlington Cnty. Bd. of Taxation</u>, 25 <u>N.J. Tax</u> 138, 147 (Tax. 2009) (discussing statutes requiring a "majority of <u>all</u> the members" as

23

> "evidenc[ing] a legislative intent to modify the common law rule"); see also 1991 Formal Op. Att'y Gen. N.J. No. 3 (May 7, 1991) ("Laws which define a quorum as a majority or larger percentage of 'all the members' or of 'the authorized membership,' or words to that effect, must . . . be read as requiring a fixed number of members which remains constant despite any vacancies.").
>
> [ELEC I, supra, 445 N.J. Super. at 200 (alterations in original).]

"[A] statute in derogation of the common law must be strictly construed . . . ." Ross, supra, 115 N.J.L. at 64. However, "this rule will not be permitted to defeat the obvious purpose of the [L]egislature, or lessen the scope plainly intended to be given to the measure." Ibid.

The statutory language at issue is contained in N.J.S.A. 19:44A-22, which addresses violations and civil penalties under the Act and provides, in pertinent part:

> b.   Upon receiving evidence of any violation of this section, [ELEC] shall have power to hold, or to cause to be held under the provisions of subsection d. of this section, hearings upon such violation and, upon finding any person to have committed such a violation, to assess such penalty, within the limits prescribed in subsection a. of this section, as it deems proper under the circumstances, which penalty shall be paid forthwith into the State Treasury for the general purposes of the State.
>
>      . . . .

> d. The commission may designate a hearing officer to hear complaints of violations of this act. Such hearing officer shall take testimony, compile a record and make factual findings, and shall submit the same to the commission, which shall have power to assess penalties within the limits and under the conditions prescribed in subsections b. and c. of this section. The commission shall review the record and findings of the hearing officer, but it may also seek such additional testimony as it deems necessary. <u>The commission's determination shall be by majority vote of the entire authorized membership thereof.</u>
>
> [(Emphasis added).]

It is undisputed that the underlined language constitutes a departure from the common law quorum requirement and requires three votes of the entire authorized membership of four. <u>ELEC I</u>, <u>supra</u>, 445 <u>N.J. Super.</u> at 200. Therefore, at least three of the four commissioners must vote on any "determination" to which that language applies. The Commission argues this requirement applies to decisions on violations and determinations of penalties. Respondents argue the fixed quorum requirement applies to all enforcement actions, including authorizing the issuance of a complaint.[8]

---

[8] Respondents also contend the parties disagree about which section of the Act the Commission was acting under when it authorized the complaint. Our review reveals no such disagreement. The complaint was issued pursuant to <u>N.J.S.A.</u> 19:44A-22.

The Act does not define the "determination" that must be made by a "majority vote of the entire authorized membership" of the Commission. See N.J.S.A. 19:44A-3. We must therefore determine whether the Legislature intended the Commission's authorization of a complaint to be a "determination" under the statute.

Our primary objective is to ascertain the intent of the Legislature by first looking to the plain words of the statute.[9] DiProspero v. Penn, 183 N.J. 477, 492 (2005). We give "the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citations omitted); Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 101 (2009). "A statute should be read as a whole and not in separate sections." Fiore v. Consol. Freightways, 140 N.J. 452, 466 (1995). A court's "task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent." Ibid. Therefore, "it is instructive to review other sections of"

_____

[9] To the extent the provision might be considered ambiguous, warranting the consideration of extrinsic evidence, including legislative history, see In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 468 (2013) ("Only if the statutory language is ambiguous do courts look beyond it to extrinsic evidence, such as legislative history, for guidance."), we note that nothing in the legislative history provides compelling support for the conclusion that the Legislature intended all actions taken by the Commission to enforce the Act be approved by a majority vote of the entire authorized membership.

a statute "which are designed to achieve the same result" in interpreting an undefined phrase. <u>Perrelli v. Pastorelle</u>, 206 <u>N.J.</u> 193, 203 (2011).

Aside from the explicit language that departs from the common law rule by establishing a different quorum requirement for a "determination" in <u>N.J.S.A.</u> 19:44A-22(d), similar language does not appear anywhere in the statute as a prerequisite for various forms of agency action.[10]  "When 'the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.'" <u>Higgins v. Pascack Valley Hosp.</u>, 158 <u>N.J.</u> 404, 419 (1999) (quoting <u>GE Solid State, Inc. v. Dir., Div. of Taxation</u>, 132 <u>N.J.</u> 298, 308 (1993)).  However, if the Legislature intended "determination" to broadly apply to other agency action, specifically the issuance of a complaint, the absence of such language in other provisions is less noteworthy.

To provide context for our review of these other provisions in the Act, we note that the APA's definitions for "contested case," "administrative adjudication" and "adjudication" acknowledge categories of decisional agency action other than a "determination." <u>N.J.S.A.</u> 52:14B-2. A "contested case" is defined as

---

[10]  The language is mirrored, however, in the parallel provision applicable to gubernatorial elections, <u>N.J.S.A.</u> 19:44A-41(d).

> a proceeding . . . in which the legal rights,
> duties, obligations, privileges, benefits or
> other legal relations of specific parties are
> required by constitutional right or by statute
> to be <u>determined</u> by an agency by <u>decisions,
> determinations, or orders</u>, addressed to them
> or disposing of their interests, after
> opportunity for an agency hearing.
>
> [<u>Ibid.</u> (emphasis added).]

The APA defines "Administrative adjudication" or "adjudication" to include "any and every <u>final determination, decision, or order</u> made or rendered in any contested case." <u>Ibid.</u> (emphasis added). In each case, the APA anticipates that, in addition to a "determination" that resolves the case, the agency is authorized to make decisions and orders.

Merriam-Webster defines "determine" as "to fix conclusively or authoritatively." <u>Determine</u>, <u>Mirriam-Webster Dictionary</u>, <u>http://www.Mirriam-Webster.com/dictionary/determine</u> (last visited Aug. 30, 2017). Among its definitions for "determination" are "a judicial decision settling and ending a controversy" or "the resolving of a question by argument or reasoning." <u>Determination</u>, <u>Mirriam-Webster Dictionary</u>, <u>http://www.Mirriam-Webster.com/dictionary/determination</u> (last visited Aug. 30, 2017).

Both the APA definitions and the dictionary definitions thus support an interpretation that "determination" applies to final resolutions as opposed to interim actions.

A-4131-15T3

In other statutory schemes, the Legislature has manifested its intent by including language that specifies the quorum necessary for "any" action. For example, N.J.S.A. 5:5-29 states, "A majority of the [New Jersey Racing] [C]ommission shall constitute a quorum for the transaction of any business, for the performance of any duty, or for the exercise of any power of the commission." (Emphasis added). In other words, the Racing Commission can transact no business, perform no duty and exercise no power without the required quorum. There is no similar sweeping limitation on the Commission's exercise of its authority under the Act.

N.J.S.A. 19:44A-6 establishes the enforcement responsibilities and regulatory authority of ELEC. Among the powers explicitly delegated, the Legislature authorized the Commission to: "investigate allegations of any violations of this act, and issue subpenas for the production of documents and the attendance of witnesses," N.J.S.A. 19:44A-6(b)(9); "[f]orward to the Attorney General or to the appropriate county prosecutor information concerning any violations of this act which may become the subject of criminal prosecution or which may warrant the institution of other legal proceedings by the Attorney General," N.J.S.A. 19:44A-6(b)(10); and "render advisory opinions [through its legal counsel] as to whether a given set of facts and

circumstances would constitute a violation of any of the provisions of this act, or whether a given set of facts and circumstances would render any person subject to any of the reporting requirements of this act," N.J.S.A. 19:44A-6(f); see also N.J.S.A. 19:44A-6.1 (specifically authorizing the Commission to issue advisory opinions and regulations that relate to candidates for Lieutenant Governor).

Each of these authorized actions represents the exercise of authority to investigate or advise based upon an evaluation of information provided to the Commission. While each reflects some decision-making by the Commission, none entails a "determination" by the Commission that a violation of the Act has occurred or that a particular penalty should be imposed. The Act imposes no requirement that any number of commissioners must vote in favor of any of these actions before the Commission may proceed.[11]

In sum, the expansive authority explicitly delegated to the Commission to investigate suspected violations of the Act is not limited by either a general restriction that requires a specific

---

[11] The regulations promulgated by the Commission, N.J.A.C. 19:25-1.1 to -26.10, shed no light on this question as they do not address the procedures for authorizing a complaint or voting requirements for any actions taken by the Commission. The Commission's regulations addressing complaints provide only for default final decisions where a respondent fails to respond to a complaint issued by the Commission within twenty days. N.J.A.C. 19:25-17.1A.

quorum for "any" agency action or for specific quorum requirements applicable to any action, except the "determination" in N.J.S.A. 19:44A-22(d). The requirement that a "determination" be made by a "a majority vote of the entire authorized membership," ibid., is a statutory requirement in derogation of the common law that warrants strict construction. The application of that principle here does not "defeat the obvious purpose of the Legislature" or diminish the scope of authority the Legislature intended to grant to ELEC. Ross, supra, 115 N.J.L. at 64. It also follows that we should not imply the explicit abrogation of the common law to provisions where the Legislature has not inserted such language. Based upon our review of the plain language of the Act, the definitions used by the Legislature in the APA and the application of established principles of statutory construction, we conclude that "determination" applies to the Commission's final resolution of a case and decisions regarding the penalty to be imposed, not to the decision to authorize a complaint. As a result, the common law quorum requirement applied and the authorization of the complaint was valid.

### B.

Respondents also argue "the Commission's determinations may not be made by the Commissioners of a single party, but rather must be further supported with the agreement of at least one

commissioner of an opposing political party." In support of their position, they cite the membership requirement contained in N.J.S.A. 19:44A-5 that no more than two members of the four-member Commission be from the same political party. This reliance is misplaced.

Although the Act plainly requires that no one political party dominate the Commission, it does not mandate membership by any political party. For example, N.J.S.A. 19:44A-5 would not be violated if four independents, with no party affiliations, were appointed to the Commission or if the membership were comprised of two members of one party and two independents. Moreover, the absence of any reference to political affiliations in the provisions that authorize specific actions by the Commission undermines respondents' argument that there should be a spillover effect from this statutory provision to all others in the Act.

Respondents attempt to buttress their argument by citing comments made by Senator William E. Schluter at a 1973 public hearing of the Assembly Judiciary Committee, which was considering the bill that became the Act. Senator Schluter stated Commission action would take a bipartisan vote of three people and the draft legislation was revised to reduce the number of commissioners from five to four to avoid "a partisan flavor." S.B. No. 1124 "The New Jersey Campaign Contributions and Expenditures Reporting Act":

<u>Public Hearing Before the Assemb. Judiciary Comm.</u>, 1972-1973 Leg. Sess. 56-57, 68-69 (1973) (statement of Sen. William E. Schluter). While these comments reflect reasoning relevant to the membership requirement, <u>N.J.S.A.</u> 19:44A-5, they provide no insight into the meaning to be given to the determination language contained in <u>N.J.S.A.</u> 19:44A-22(d) because that language was not added to the statute until an amendment was adopted three months later, in April 1973. <u>See</u> <u>L.</u> 1973, <u>c.</u> 83, § 22. We therefore find no basis to adopt respondents' interpretation that the Act requires a bipartisan vote to authorize a complaint.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION